UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
WILLIAM A. TEITELBAUM,

                Plaintiff,

    -against-

LAY SIOK LIN, PLATINUM TOO LLC,
BRUCE MABEY,

                Defendants.
-----------------------------------------------------------------------x
LAY SIOK LIN,

                Plaintiff on the Counterclaim
                and Crossclaim,

    -against-

WILLIAM A. TEITELBAUM,

                Defendant on the Counterclaim,

    and

PLATINUM TOO LLC, BRUCE MABEY,

                Defendants on the Crossclaims.
-----------------------------------------------------------------------x

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

CV 07-3971 (LDW) (ETB)

Wexler, District Judge

      Plaintiff William A. Teitelbaum ("Teitelbaum") brought this declaratory judgment action

against Lay Siok Lin ("S. Lin"), Platinum Too LLC ("Platinum"), and Bruce Mabey ("Mabey")

for determination of his liability, if any, concerning certain promissory notes issued to Lin and

Aziz Mochdar ("Mochdar") – later added as a defendant.  Lin and Mochdar ("Lin/Mochdar" or

the "Lenders") brought counterclaims against Teitelbaum and crossclaims against Platinum and

Mabey.  Below are the Court's findings of fact and conclusions of law following a bench trial.

Case 2:07-cv-03971-LDW-ETB   Document 150   Filed 08/03/10   Page 2 of 34

2

### FINDINGS OF FACT

A.  The Parties and Other Persons

1.      S. Lin is a resident of Indonesia and a party to a promissory note dated March 8, 2005 ("Lin Note").

2.      Mochdar is a resident of Indonesia and a party to a promissory note dated December 28, 2004 ("Mochdar Note").[1]

3.      Teitelbaum is a resident of Suffolk County, New York and a cofounder of Platinum. Teitelbaum resigned as a member of Platinum on August 7, 2006.

4.      Mabey is a resident of the state of Utah and a cofounder of Platinum.

5.      Platinum is a limited liability company organized pursuant to the laws of the state of Utah.

6.      Dressel Investment Ltd. ("Dressel") is an investment company organized pursuant to the laws of the British Virgin Islands that did business in Indonesia.  Dressel went out of business in 2007, after it was discovered that the company was being operated as a ponzi scheme.[2]

7.      Donald Sherer ("D. Sherer"), who testified as a third-party witness, is a former co-director of Dressel, having served in that capacity from 2002 to 2005.

---

[1]The parties stipulated to add Mochdar as a plaintiff on the counterclaims and crossclaims and to amend S. Lin's answer to incorporate by reference the allegations and claims she raised in an action commenced on May 12, 2008 in the Northern District of California, which action was transferred to this Court ("Amended Lin Answer").

[2]Indeed, Lin/Mochdar's counsel stated at trial that "most of the people involved are in jail or dead."  Trial Transcript ("Tr.") 309.

Case 2:07-cv-03971-LDW-ETB   Document 150   Filed 08/03/10   Page 3 of 34 PageID #:
2265
Case 2:07-cv-03971-LDW-ETB   Document 150   Filed 08/03/10   Page 3 of 34

3

8.      Michele Sherer ("M. Sherer"), who testified as a third-party witness, was employed by Dressel to track investments and the flow of funds between Asia and the United States and to verify Dressel's receipt of funds so that it could issue certificates of investment.

9.      Mei Lay Lin ("M. Lin"), now deceased, was a resident of Indonesia and S. Lin's sister.[3]

10.     Patrick Daleiden ("Daleiden"), who testified as a third-party witness, is a resident of the state of Florida.

B.  Formation of Platinum

11.     In May 2004, Mabey and Teitelbaum created Platinum following discussions they had with Danny Wong ("Wong") and D. Sherer, who were co-directors of Dresssel.

12.     Based upon those discussions, Mabey and Teitelbaum agreed that in exchange for Dressel providing the initial capital to cover Platinum's operating expenses and sufficient funds to close business opportunities originated by Platinum, Platinum would give Dressel a 50% stake in any interest Platinum acquired on account of its successful closing of an opportunity, net of expenses.

13.     On May 24, 2004, Dressel wired $2.2 million to Platinum, and on November 24, 2004, it wired $80,000 to Platinum.

14.     The $2.2 million that Dressel deposited into Platinum occurred before any funds were given to Platinum by investors for investment purposes.

C.  M. Lin's Relationship With Dressel

---

[3]Counsel stipulated to admit M. Lin's deposition testimony into evidence.

4

15.    In 2001, M. Lin became head of marketing for MultiJaya Perkasa, an Indonesian company and Dressel agent, and worked for and took instructions from Wong on behalf of Dressel.

16.    In October 2004, M. Sherer learned that Dressel was being operated as a ponzi scheme when she was not getting answers from Wong and from others, including Dressel's general counsel, about the status of Dressel's investment funds.

17.    From 2001 until it closed in 2007, Dressel was controlled by three directors, Wong, D. Sherer, and Dave Taker.

18.    As head of marketing, M. Lin was responsible for finding and bringing to Dressel groups of Indonesian investors, conducting seminars, and raising the funds for Dressel's business opportunities.

19.    M. Lin held herself out as a sophisticated, professional investment broker.  She became acquainted with her clients' businesses and investment objectives, undertook investment-related research for her clients, and made recommendations to her clients.

20.    M. Lin supervised 100 Dressel brokers and had 700 clients who invested with Dressel, including the Lenders and Farida Kamil ("Kamil").

21.    Mabey understood M. Lin to be Dressel's agent and manager in Indonesia, where she and Dressel created numerous offices for purposes of raising capital from individuals in Indonesia.  M. Sherer described M. Lin as the owner and manager of Dressel's office in Jakarta.

22.    M. Lin used the commissions and bonuses she received from Dressel to cover its payroll and other operating expenses in Indonesia.

Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 5 of 34

5

23.     M. Lin received $1,789,169 in commissions from Dressel for her services.

24.     M. Lin's clients who invested funds with Dressel included S. Lin, Mochdar, and Farida, with Farida generating the greatest portion of the commissions and bonuses Dressel paid to M. Lin.

D.  The ProtoStar Project

25.     In April and May 2004, Mabey attended several meetings at Dressel's offices in Jakarta, where he discussed various business opportunities that Platinum was pursuing for investment purposes, including ProtoStar – a satellite communication company located in San Francisco whose owners were interested in raising capital for an initial structuring of that company.

26.     D. Sherer testified that Dressel made M. Lin responsible for finding investors willing to invest a total of $10 million to enable Platinum to consummate the ProtoStar opportunity. He testified that Dressel understood that Platinum had only a short window of opportunity to come up with the required funds or that opportunity would not be available.

27.     Platinum had lost its ability to consummate the ProtoStar opportunity by the end of November 2004, a fact known by those at Dressel.

E.  M. Lin's Relationship With Platinum and Investments in Platinum

28.     Platinum had a total of four persons who invested funds in Platinum, all found by M. Lin.

29.     Each of the four investors signed promissory notes with Platinum:  (1) Budianto Hardjasaputra ("Budianto"), who invested $1 million on October 31, 2004; (2) Mochdar, who invested $2,080,000, pursuant to the Mochdar Note, dated December 28, 2004; (3)

6

S. Lin, who invested $800,000 of Farida's money, pursuant to the Lin Note, dated March 8, 2005; and (4) Honggo Purnomo ("Honggo"), who invested $500,000 on March 10, 2005.

30.   M. Lin knew that the ProtoStar opportunity was no longer available to Platinum before she presented Mochdar with the Mochdar Note for his signature on December 28, 2004, and before she presented S. Lin with the Lin Note for her signature on March 8, 2005.

31.   The Notes were executed by Platinum.  Neither Mabey nor Teitelbaum signed the Notes in his individual capacity.

32.   In a draft letter agreement dated January 20, 2005, Mabey proposed to pay M. Lin pursuant to a commission schedule, which depended upon her meeting certain goals in finding sufficient investors to invest in Platinum.  The parties never signed the document.

33.   Other than an agreement to pay M. Lin commissions, as a finder, Platinum did not enter into any other agreement with M. Lin making her an employee or authorized agent of Platinum.

34.   M. Lin testified that she told S. Lin that she was taking 10% of the loan proceeds of the Lin Note as a commission.

F.  S. Lin, Farida, and the Lin Note

35.   After receiving a masters of business administration degree from Notre Dame College in California, S. Lin was employed for three years at PriceWaterhouseCoopers in Jakarta.

36.   Upon leaving PriceWaterhouseCooper's employ, she became, and today remains, a housewife.  She maintains that her husband does not allow her to work for others, and that her sole source of income is a $3,000 monthly stipend that he gives her.  She testified

Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 7 of 34 PageID #:
Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 7 of 34
2269

that she is unable to present any of her bank statements to enable the Court to confirm her status as an unemployed housewife living on $36,000 a year because her bank, Panin Bank, does not issue bank statements to its customers, an explanation the Court does not find credible.

37.    In 2001, pursuant to written agreements with Dressel, S. Lin appointed Dressel to administer and manage her accounts with Dressel.

38.    S. Lin invested with Dressel $10,000 in 2001, $20,000 in 2002, $10,000 in 2003, and $30,000 in 2004.

39.    S. Lin gave $28,000 to Mabey in November 2006, some of which was to cover his purchase of a watch.

40.    Despite her testimony that she never worked for or with M. Lin, S. Lin was physically present in M. Lin's offices in Jakarta where she was observed assisting M. Lin in servicing Dressel's clients through 2004 and into 2005.

41.    S. Lin's presence at Dressel meetings was confirmed by M. Lin, who acknowledged that S. Lin was personally present at the same directors' meetings held at Dressel's offices at which Mabey discussed ProtoStar.

42.    Contrary to her testimony describing herself as nothing more than a housewife and friend to Farida, it appears that S. Lin was involved in servicing Dressel's clients and in attending high-level meetings at Dressel's headquarters in Indonesia in 2004 and 2005.

43.    Given her presence at Dressel meetings when ProtoStar was discussed and servicing clients in M. Lin's offices, S. Lin knew that Platinum had lost its ability to consummate ProtoStar before the Lin Note was signed.

Case 2:07-cv-03971-LDW-ETB   Document 150     Filed 08/03/10   Page 8 of 34

8

44.    According to S. Lin, Farida was the actual person who funded the Lin Note.  In this respect, Farida wired Platinum approximately $842,000 on March 8, 2005, relating to the Lin Note.  Farida also transferred $240,000 to M. Lin, representing commissions Platinum owed M. Lin on the Mochdar Note.

45.    The Lenders did not call Farida as a witness or show her unavailability to testify except through S. Lin's testimony that Farida was too ill to travel, notwithstanding the crucial nature of Farida's testimony as the person who funded the Lin Note based on discussions with S. Lin.  The record shows no attempt by the Lenders to preserve Farida's testimony.

46.    The Lenders did not present any written communication between Platinum and Farida.

47.    Because Farida did not testify, and because S. Lin's testimony describing her relationships with M. Lin, Dressel, and Farida are less than credible, this Court is unable to determine the actual nature or extent of Farida's involvement with the Lin Note, including the circumstances that actually induced her to fund the Lin Note or the representations that were made to her or that she relied upon or whether her reliance on any representation was either justified or reasonable.

48.    Between 2001 and 2005, S. Lin received $1,370,180 from Dressel as returns on money she invested.

49.    Platinum paid S. Lin $200,000 in January 2005, $42,000 in March 2005, and $250,000 in November 2006.  According to S. Lin, the $200,000 was for M. Lin's commissions for procuring the Mochdar Note.  She claims that she paid that money over to M. Lin, allowing M. Lin to use her account because M. Lin didn't want Dressel to know of her business with Platinum.  As for the $42,000, she claims that Platinum refunded this

9

amount to her because Farida paid a total of $1,082,000 (i.e., $842,000 and $240,000 to Platinum and M. Lin, respectively, as noted above), instead of $1,040,000, as contemplated by the Lin Note. As for the $250,000, she claims that she received those funds on M. Lin's behalf as part of an arrangement whereby Platinum funded a Manor Capital office in Indonesia, as discussed below.

G. Mochdar and the Mochdar Note

50.     Mochdar is a wealthy, sophisticated investor and businessman who owns or owned a factory employing about 400 people and other businesses, including an interest in a satellite communications business known as Hughes Direct TV.

51.     Starting in 2001, Mochdar began investing with Dressel, using M. Lin, a family friend whom he had known for about 30 years, as his investment broker and advisor.

52.     A longstanding relationship developed between Mochdar and M. Lin, pursuant to which M. Lin made recommendations to Mochdar concerning the investment of his funds and administered and managed those funds on his behalf. Mochdar agreed to invest substantial sums of money based upon her word alone.

53.     During the trial, Mochdar testified about his decision to invest in Rhodium, a project that concerned the mining and processing of minerals for commercial use.

54.     Dressel was selling the Rhodium investment opportunity to its clients, including Mochdar.

55.     M. Lin made it her business to familiarize herself fully about the Rhodium project, knowing that Mochdar would rely upon her recommendation.

Case 2:07-cv-03971-LDW-ETB   Document 150   Filed 08/03/10   Page 10 of 34

10

56.     On November 2, 2003, based solely upon M. Lin's recommendation, Mochdar executed various documents pursuant to which he agreed to give $1.6 million to Dressel to invest in the Rhodium project, with the understanding that one year later, he would receive $2,080,000.

57.     One of the documents Mochdar signed that day was a limited power of attorney, which he understood to confer powers upon the persons chosen to be the attorneys-in-fact.

58.     Even though he did not know them personally, Mochdar appointed two directors of Dressel, Wong and D. Sherer, to act as his attorneys-in-fact for purposes of transacting and administering his investment in the Rhodium project.

59.     Mochdar based his decision to appoint two strangers, Wong and D. Sherer, to be his attorneys-in-fact, based solely upon M. Lin's recommendation.

60.     Mochdar's note relating to the Rhodium project went into default in November 2004.

61.     In November 2004, Platinum, M. Lin, and Dressel agreed to a transaction whereby Platinum paid off Dressel's obligation to Mochdar on the Rhodium project in the amount of $2,080,000.  In return, Mabey and Teitelbaum received consideration from Dressel in the form of an assignment of another note relating to a company, PharmaSea, in which they had a personal interest.

62.     Acting pursuant to M. Lin's instructions, Platinum wired $1,080,000 directly to Mochdar's account and $500,000 each to accounts of Mabey and Teitelbaum, who, on November 29, 2004, then caused those funds to be wired into Mochdar's account.

63.     Mochdar testified that he never heard about Platinum, Mabey or Teitelbaum until _after_ he had received the $2,080,000 on November 29, 2004.

Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 11 of 34

11

64.     Shortly after Mochdar received the $2,080,000, M. Lin recommended to him that he invest the same amount with Platinum, with a 35% annual rate of return payable two years later.

65.     M. Lin gave Mochdar a copy of a PowerPoint document entitled "Private & Confidential: Proprietary Financing Information; ProtoStar Distribution; ProtoStar" ("ProtoStar Document"), that Mabey used during his meetings in Indonesia in 2004, six months earlier, when he discussed ProtoStar with Dressel's directors and brokers as a potential investment opportunity.

66.     Mochdar's trust of M. Lin was such that when she handed him the ProtoStar Document, Mochdar merely skimmed its contents.

67.     Mochdar so trusted M. Lin that based upon her word alone, he agreed to wire the money directly into Platinum's account on December 21, 2004, seven days <u>before</u> he saw the Mochdar Note and without knowing anything about Platinum, Mabey or Teitelbaum.

68.     Similarly, he merely skimmed over the Mochdar Note before actually signing it.

69.     Mochdar did not make inquiry or conduct any investigation regarding the bona fides of Platinum or ProtoStar either before or after he decided to commit to the funding of the Mochdar Note; instead, he relied exclusively upon M. Lin's recommendation and her investigation regarding the ProtoStar project.  He did not even bother to read the Mochdar Note to see if it contained the word "ProtoStar."

70.     The ProtoStar Document is the only written material that Mochdar read in connection with his decision to sign the Mochdar Note.

Case 2:07-cv-03971-LDW-ETB   Document 150   Filed 08/03/10   Page 12 of 34

12

71. The ProtoStar Document contains no information about ProtoStar's management, track record or plan or commitment to launch any satellite into orbit at any time or for any purpose.

72. Unlike the ordinary investor, Mochdar's familiarity with satellite communication companies gave him the special knowledge and unique ability to investigate the bona fides of ProtoStar and its investment worthiness.

73. Nevertheless, in deciding to commit his funds to Platinum, the only representation that Mochdar regarded as material to his decision was the short-term nature of the investment and M. Lin's recommendation.

74. It was Mochdar's longstanding personal relationship with M. Lin, as his friend, investment broker, and advisor, and not the Representations that were material to Mochdar's decision to invest and sign the Mochdar Note.

75. Given Mochdar's reliance on M. Lin as his investment advisor, this Court finds less than credible M. Lin's testimony that, despite knowing him for many years, she never talked business with him.  Similarly, the Court finds less than credible M. Lin's testimony that even though Farida's account with Dressel was the greatest source of commissions M. Lin received during her years with Dressel, she never once spoke to Farida, not even to give her investment advice.

76. Platinum has made no repayment of interest or principal on the Mochdar Note.

H. Dressel Closes as Ponzi Scheme is Uncovered

77. In October 2004, just before Mochdar's Rhodium note became due, M. Sherer began inquiring about her inability to find any record supporting Dressel's claims to its

Case 2:07-cv-03971-LDW-ETB   Document 150   Filed 08/03/10   Page 13 of 34 PageID
#: 2275
Case 2:07-cv-03971-LDW-ETB   Document 150   Filed 08/03/10   Page 13 of 34

13

investors that $80 million of their funds had been invested in projects located in the United States.

78.    Following M. Sherer's and others' inquiries, Dressel was closed and Wong purportedly went into hiding after it was discovered that Dressel had been conducting a massive ponzi scheme in Indonesia.[4]

79.    Dressel's operation as a ponzi scheme could not have gone unnoticed by M. Lin, given that she was Dressel's head of marketing for Indonesia, that she had 700 Dressel-clients, and that she received almost $2 million in commissions from Dressel by the time the ponzi scheme became public.

80.    The discovery of this ponzi scheme seems to explain testimony that M. Lin believed that her life and S. Lin's life were in jeopardy and why law enforcement authorities in Indonesia confiscated S. Lin's and M. Lin's records.

I.  The Alleged Fraudulent Representations

81.    Lin/Mochdar allege that Mabey and/or Teitelbaum made the following fraudulent representations (collectively, "Representations") to them in connection with the sale of the Lin Note and the Mochdar Note (collectively, "Notes"):

   a.    a verbal representation that they would invest the loan proceeds exclusively in ProtoStar;

---

[4]When the Court asked D. Sherer to explain why Dressel's investors were getting back funds based upon something other than their investment, he responded, "[b]ecause this is what Danny Wong did with investor funds, he and [M. Lin] and other people in Indonesia were moving money around from place to place, and this is why we filed complaints with the British Virgin Islands, the Hong Kong government and U.S. government against Dressel." Tr. 301.

14

    b.    a verbal representation that Teitelbaum was a founding member of Bear Stearns & Co., Inc. ("Bear Stearns"), a leading investment banking institution located in New York, New York;

    c.    a verbal representation that Teitelbaum was Bill Gates' next-door neighbor;

    d.    a representation that Platinum is a New York investment company; and

    e.    a representation that Platinum and its principals had expertise in investing in and managing business enterprises, mergers, and acquisitions.

82.    In addition to the Representations, the Lenders testified to receiving the ProtoStar Document.

## J.  The "Loan Purpose" Stated in the Notes

83.    The following language appears on the face of the Notes concerning Platinum's authority to apply the loan proceeds:  "LOAN PURPOSE:  Borrower and Lender mutually agree that Borrower shall have discretionary use of the loan proceeds in conducting its business activities."

84.    Nothing in the Notes would justify a reasonable person investing in them to conclude that, notwithstanding the statement of "LOAN PURPOSE," Platinum's authority to invest the loan proceeds was restricted to ProtoStar and for no other purpose.

85.    The contradiction between what the Notes say Platinum may do with the loan proceeds and the prior verbal representation regarding Platinum's use of the loan proceeds to invest exclusively in ProtoStar should have suggested to the Lenders that such verbal representation about ProtoStar could not be relied on.

Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 15 of 34 PageID
#: 2277
Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 15 of 34

15

86.     The Lenders admit that they did not make any inquiry or conduct any investigation to determine if or to what extent the loan proceeds were going to be or had actually been invested in ProtoStar.

K.  Operation of Platinum

87.     On May 17, 2004, the organizer for Platinum filed Articles of Organization, which was amended and restated on July 22, 2004.

88.     Platinum filed annual reports with the Utah Secretary of State for the years 2005 through 2008.

89.     As noted, on May 24, 2004 and November 24, 2004, Dressel transferred $2.2 million and $80,000, respectively, to Platinum.

90.     Platinum's general ledger shows the following $6,660,000 in receipts:  (1) the loan proceeds of $2,080,000 from Mochdar, $800,000 from S. Lin/Farida, $1,000,000 from Budianto, and $500,000 from Honggo; and (2) the $2,280,000 from Dressel's funding of Platinum.

91.     Platinum's general ledger shows the following $6,646,291 in disbursements: (1) $2,080,000 to Mochdar, in connection with the payment of Mochdar's Rhodium debt ($1,080,000 by wire on November 24, 2004 and $500,000 each to Mabey and Teitelbaum on November 12, 2004 and November 15, 2004, respectively); (2) $1,300,000 to Budianto on November 8, 2005, as repayment of his note, inclusive of interest ; (3) $200,000 to S. Lin on January 19, 2005, as commissions relating to the execution of the Mochdar Note; (4) $267,822 to M. Lin as commissions (through payments of $52,822 on July 16, 2004, $75,000 on October 1, 2004, $60,000 on January 10, 2005, and $80,000 on

Case 2:07-cv-03971-LDW-ETB   Document 150   Filed 08/03/10   Page 16 of 34 PageID
#: 2278
Case 2:07-cv-03971-LDW-ETB   Document 150   Filed 08/03/10   Page 16 of 34

16

January 20, 2005); (5) $250,000 to S. Lin on December 1, 2006, purportedly on account of an agreement involving Platinum funding a Manor Capital office in Indonesia, discussed below; (6) $100,000 to Options Ltd., a Wong-controlled entity, on June 1, 2004, purportedly as a fee for originating the agreement between Dressel and Platinum; (7) $420,000 to Teitelbaum, purportedly as compensation (through various payments from June 3, 2004 to April 13, 2005); (8) $420,000 to Mabey, purportedly as compensation (through various payments from May 25, 2004 to April 22, 2005); (9) $777,469, which includes vehicle purchases in the amount of $432,658 on February 18, 2005 and March 23, 2005; (10) $125,000 in commission-related expenses on account of trades made by Bear Stearns on Platinum's behalf; and (11) $706,000, purportedly paid by Platinum pursuant to the agreement involving Manor Capital ($100,000 on November 28, 2006; $25,000 on November 28, 2006; $25,000 on November 29, 2006; $31,000 on November 30, 2006; $260,000 on December 1, 2006; $190,000 on December 1, 2006; and $75,000 on December 4, 2006). As for the $706,000, Platinum's banking statements show that $335,000 of this amount ($260,000 on December 1, 2006, and $75,000 on December 1, 2006) went to Manor Capital. However, Platinum's banking records show that $221,000 ($31,000 on November 30, 2006 and $190,000 on December 1, 2006) went to the "Mabey Family Trust," not Manor Capital, and the remaining $150,000 does not appear in Platinum's banking records. Nevertheless, Mabey testified that on November 27, 2006, Platinum transferred $150,000 to Platinum Investments, LLC, a company he controlled. According to Mabey, the $221,000 and $150,000 were held by him on account of the agreement involving Manor Capital.

Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 17 of 34 PageID
#: 2279
Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 17 of 34

17

92.    Mabey and Teitelbaum maintain that they were active participants in Platinum's operations from its inception in May 2004 until August 7, 2006, when Teitelbaum resigned, with Mabey responsible for business development and Teitelbaum responsible for originating, structuring, and closing business opportunities.

93.    Platinum did not invest the Lenders' or the other investors' funds in any investment other than the stock market through an account with Bear Stearns.  Platinum lost approximately $121,000 in its stock market investments from March 2005 through November 2006. Defendants claim that Platinum did not consummate various business opportunities that it had originated because Dressel failed to fulfill its commitment to provide sufficient funds necessary for those purposes.  Nevertheless, defendants claim that Platinum was still required to pay various operating expenses, including its retention of law firms and other consultants, with payments made either from Platinum's operating account or personally by Mabey and Teitelbaum.

94.    Teitelbaum testified that he reimbursed Mabey for Platinum-related expenses that he personally incurred on an American Express credit card held by Mabey's company, "Platinum Investments, LLC."

95.    Platinum Investments, LLC's American Express statement in November 2005 reveals that many of the charges that Teitelbaum claimed as Platinum-related expenses were not reasonably related to Platinum's business.  For example, many of the charges were for purchases from retailers close to Teitelbaum's home, such as Home Depot, Jimmy John's Sandwich Shop, Blockbuster, and numerous local gas stations.

Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 18 of 34

18

96.    Platinum's tax returns were prepared after their due dates.  Platinum did not prepare tax returns for 2004 until June 2007, after litigation was threatened, and did not prepare returns for 2005 and 2006 until June 2008, after litigation began.  Platinum did not operate consistent with its own operating agreement.  For example, Mabey and Teitelbaum took more than $420,000 each in mostly monthly distributions from Platinum in 2004 and 2005, in violation of ¶ 4.04(a) of the Platinum operating agreement.  That provision allows distributions to be made only quarterly, and only out of "Available Funds," as defined in ¶ 1.02.[5]  Rather than take distributions out of "Available Funds," Mabey and Teitelbaum took them out of investor money, in contravention of the operating agreement.  Although Teitelbaum purportedly resigned from Platinum on August 7, 2006, he remained involved in the accounting of the company, in contravention of ¶ 3.08(b) of the operating agreement.  Teitelbaum continued to take money from Platinum's accounts through May 2007.  He oversaw the preparation of the company's general ledger in 2008, nearly two years after he resigned from the company.  Teitelbaum falsified two affidavits on behalf of Platinum relating to the purchase of two Mercedes-Benzes, in an effort to avoid payment of New York State sales taxes, claiming that he did not live or work in New York State.  When Teitelbaum executed the affidavits, he worked in Platinum's offices in Melville, New York, and resided in New York.

---

[5]Paragraph 1.02(d) defines "Available Funds" as "the Company's gross cash receipts from operations, less the sum of: (1) payments of principal, interest, charges and fees pertaining to the Company's indebtedness; (2) expenditures incurred incident to the usual conduct of the Company's business; and (3) amounts reserved to meet the reasonable needs of the Company's business."

Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 19 of 34

19

97.    Despite the large liabilities that Platinum owed its investors, both Mabey and Teitelbaum took substantial amounts of cash and property (such as four Mercedes-Benzes) from Platinum when it was insolvent.  There are no documents or other evidence sufficient to show that the money that Mabey and Teitelbaum took from Platinum was in any way connected to their performance, to work performed, or to any reasonable yardstick of executive compensation.  Much of the money and property taken by Mabey and Teitelbaum is not recorded, or not correctly recorded, in Platinum's books.  For example, the transfer of the four Mercedes-Benzes from Platinum to Mabey and Teitelbaum personally are not in the ledger or tax returns.  Large payments to Mabey and Teitelbaum in August 2006 (after Teitelbaum left the company) are not reflected in the ledger or tax returns.  Platinum transferred $150,000 on November 27, 2006 to Mabey's separate company, Platinum Investments, LLC, and a total of $221,000 on November 30, 2006 and December 1, 2006 to the Mabey Family Trust.  These amounts are not attributed to Mabey in the ledger or tax returns.  In addition, numerous small payments taken by Mabey and Teitelbaum through June 2007 are not reflected anywhere in Platinum's books or tax returns.

98.    Platinum failed to keep contemporaneous accounting books and records, timely file tax returns, or properly account for Platinum's tangible personal property when S. Lin's and Mochdar's investments were received and expended.  Although Platinum executed minutes of a purported August 7, 2006 meeting of members, memorialized, among other things, Teitelbaum's resignation from the company, there are no minutes setting officer compensation and distributions, approving payments to officers, and authorizing loans

Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 20 of 34

and other business transactions with third parties in which Mabey and Teitelbaum had an interest. The general ledger provided by Platinum is incomplete. Substantial amounts relating to transactions in the Bear Stearns account are absent from the general ledger. Many payments from the Bear Stearns account were made to Mabey and Teitelbaum personally, and are not recorded in Platinum's books.

99.    Mabey and Teitelbaum frequently used Platinum funds for personal expenses having nothing to do with earning money for Platinum. In addition to the four Mercedes-Benzes, Mabey and Teitelbaum used Platinum's funds to purchase jewelry, carpet, and stock options for their own personal purposes. They took a distribution of $180,000 each in October 2004, even though the company had never earned a penny. Teitelbaum used Platinum to purchase thousands of dollars worth of small leases from his son's company, "Securi-Tech," as an "accommodation." Teitelbaum later took money from Platinum's bank accounts for himself for payments made to Platinum by the lessees. Mabey took $371,000 as Platinum was winding down in November and December 2006, without corporate resolution or other official action. These payments are not attributed to him in the general ledger. Other than some trading in the stock market, Platinum made little effort to properly invest Lin's and Mochdar's money. Rather, investor funds were used as a slush fund dedicated to Mabey's and Teitelbaum's various personal interests. Teitelbaum's testimony and evidence relating to his incurring unreimbursed expenses for Platinum was unconvincing. Platinum Investments, LLC's November 2005 American Express statement reveals that expenses Teitelbaum claimed as Platinum-related expenses were in fact personal expenses.

Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 21 of 34 PageID
#: 2283
Case 2:07-cv-03971-LDW-ETB    Document 150    Filed 08/03/10    Page 21 of 34

21

100.    Platinum dissolved on July 28, 2008.  There are no company minutes relating to the
dissolution of the company, nor corporate records indicating the disposition of Platinum's
assets, if any.

L.  The Relationship Between the Lenders, Daleiden, and Manor Capital

101.    According to defendants, following several meetings, at which S. Lin was present,
M. Lin, Daleiden and Mabey agreed as of November 9, 2006 that Platinum would
underwrite the expenses associated with Daleiden opening a new office for Manor
Capital in Indonesia in return for discharging Platinum from its obligation on the Notes.
According to defendants, Daleiden agreed to "assume" the Notes as part of an elaborate
financial arrangement with Mabey to satisfy a preexisting obligation he owed to Mabey.

102.    Purportedly acting pursuant to this agreement, Platinum caused $250,000 to be wired to
S. Lin to open the new office in Indonesia.  Although S. Lin testified that the $250,000
came from Manor Capital and not from Platinum, she understood that these funds were
intended to be used to open the new Manor Capital office in Indonesia, and for that
reason and on that basis she transmitted the $250,000 to M. Lin.

103.    M. Lin proceeded to use the funds received from Platinum to pay suppliers for Manor
Capital and to pay $126,000 rent in advance to an unspecified landlord for the purpose of
opening a new Manor Capital office in Indonesia.  In addition, M. Lin provided a detailed
written quotation to Daleiden regarding the proposed use of additional funds.

104.    The Court finds that S. Lin knew that the $250,000 wired into her account occurred as a
result of some agreement by which Platinum would be using its funds to underwrite the
expenses associated with Manor Capital opening its new office in Indonesia.

22

105.    The Court finds that Platinum agreed to pay these funds based on some agreement to fund Manor Capital's new office, with S. Lin's knowledge or consent, but the evidence is not sufficient to show an agreement to completely discharge Platinum from its obligation to S. Lin on the Lin Note or that the payments actually made by Platinum to or on behalf of Manor Capital constituted full performance of any such agreement to completely discharge Platinum. Indeed, by correspondence to S. Lin in 2007, Mabey acknowledged Platinum's debt to her.

106.    The Court finds that the evidence is not sufficient to establish that Mochdar had knowledge of or gave consent to any such agreement regarding the funding of Manor Capital and discharge of Platinum, or that M. Lin had actual or apparent authority to bind Mochdar to such an agreement. Indeed, by correspondence to Mochdar in 2007, Mabey acknowledged Platinum's debt to him.

## DISCUSSION AND CONCLUSIONS OF LAW

107.    The parties do not dispute that subject matter jurisdiction and venue are proper. 28 U.S.C. § 1331; 15 U.S.C. § 80a-43; 28 U.S.C. § 1391.

108.    Teitelbaum seeks a declaratory judgment under 28 U.S.C. § 2201 of his liability, if any, concerning the Notes.

109.    Lin/Mochdar assert five claims: (1) violation of § 5 of the Securities Act of 1933, 15 U.S.C. § 77e (failure to register the Notes); (2) violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (fraudulent representations relating to the sale of the Notes); (3) common-law fraud; (4)

23

as to Platinum, breach of contract; and (5) as to Mabey and Teitelbaum, alter ego liability for Platinum's breach of contract.

110.  At the start of the bench trial, the parties agreed that Lin/Mochdar would proceed as the plaintiffs with respect to the claims they asserted in the Amended Lin Answer.

A.  Statute of Limitations Defense

111.  As for the statute of limitations defense, Lin and Mochdar argue that defendants waived this defense. However, the record shows that Platinum timely raised this defense by a motion to dismiss and in its late-filed answer to the Amended Lin Answer. The lateness of Platinum's answer was never challenged by Lin/Mochdar. As for Mabey and Teitelbaum, the Court finds that each has sufficiently raised the statute of limitations defense. Mabey sufficiently asserted the defense in joining Platinum's renewed motion to dismiss (the original motion having included the statute of limitations defense) in opposition to Lin/Mochdar's motion for summary judgment. Teitelbaum sufficiently raised the defense in his motion to amend his answer, upon which the Court reserved decision. Although the motion to amend expressly requested the right to assert the defense of failure to state a claim, Teitelbaum clearly argued that the motion included the assertion of the statute of limitations defense. Upon consideration, the Court now grants the motion. Lin/Mochdar had sufficient notice of this defense (timely asserted by Platinum in its motion to dismiss, filed more than six months before discovery was certified as complete) and sufficient opportunity to address it during discovery. Accordingly, the Court concludes that the defense has not been waived.

B.  Unregistered Sale of Securities Claim

112.    Lin/Mochdar claim that defendants sold the Notes to them without first registering them, in violation of § 5 of the Securities Act, 15 U.S.C. § 77e.[6] Violations of § 5 are made actionable by § 12(a)(1) of the Securities Act, 15 U.S.C. § 77l(a)(1).

113.    Although defendants concede that Platinum never registered the Notes as securities, or performed any other registration, they assert that this claim is barred by the statute of limitations, is subject to the "private-offering" exemption, and is barred by the Lenders' wrongful conduct under the "in pari delicto" and "unclean hands" doctrines. Lin/Mochdar maintain that defendants never pled, and therefore waived, the affirmative defenses of in pari delicto and unclean hands.

114.    As for the statute of limitations defense, a claim under § 12(a)(1) must be brought within one year after the violation upon which it is based or three years after the security was first offered to the public, whichever comes first. See 15 U.S.C. § 77m; P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 100-06 (2d Cir. 2004); Sanderson v. Roethenmund, 682 F. Supp. 205, 208 (S.D.N.Y.1988). The alleged violations (i.e., the sale or delivery of the Notes) took place no later than December 28, 2004 (when the Mochdar Note was signed) and March 8, 2005 (when the Lin Note was signed). Because this action was commenced more than one year after the alleged violation occurred, the action is time-barred. Moreover, "[a]lthough the statute of limitations may be tolled where the defendant actively conceals the violation," Sanderson, 682 F. Supp. at 208, the evidence

---

[6]To establish a violation of § 5 for the unregistered offer or sale of securities, a plaintiff must show " '(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communications and the mails in connection with the offer or sale.' " Eur. & Oversees Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 124 n.4 (2d Cir. 1998) (quoting In re Command Credit Corp., 1995 WL 279776, *2 (S.E.C. April 19, 1995)).

is not sufficient to demonstrate active concealment by defendants. Therefore, the statute of limitations on this claim expired before the action was commenced. Accordingly, Lin/Mochdar's unregistered securities claim is barred by the statute of limitation and is dismissed.[7]

C. Securities Fraud Claim

115.   Lin/Mochdar claim that Mabey and Teitelbaum violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by making the Representations in connection with the sale of the Notes. Defendants argue that this claim is barred by the statute of limitations, by the Lenders' wrongful conduct (under the in pari delicto doctrine), and is not supported by the evidence.

116.   To state a claim for relief under § 10(b) and Rule 10b-5, the Lenders must prove that defendants: " '(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which [the Lenders] relied; and (5) that [the Lenders'] reliance was the proximate cause of their injury.' " Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (quoting In re IBM Secs. Litig., 163 F.3d 102, 106 (2d Cir. 1998)).

117.   Defendants do not dispute that the Notes are securities within the meaning of § 10(b).

118.   A representation is considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to invest. See Basic

_____

[7]Based on this determination, the Court need not determine whether the "private-offering" exemption applies or whether the claim is barred by the in pari delicto or unclean hands doctrines.

26

Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); SEC v. Bausch & Lomb Inc., 565 F.2d 8, 15 (2d Cir. 1977).

119.    Of the Representations that form the basis for their fraud claim, the Court holds that two were immaterial as a matter of law: that Teitelbaum was Bill Gates' neighbor, and that Teitelbaum was a founding partner of Bear Stearns. As for the former, the Court concludes that there was no substantial likelihood that any reasonable person would have considered that information to be important in deciding whether to invest in the Notes. In any event, the Lenders made no attempt to explain on what basis they believed that such information was important to them in deciding to invest in the Notes. As for the representation concerning Bear Stearns, M. Lin testified during her deposition that she knew that Bear Sterns is an investment company that was established 100 years ago. She obviously knew that Teitelbaum, given his age, could not have been a "founder" of Bear Sterns. In any event, S. Lin testified at trial that she was not "too sure" that Teitelbaum represented that he was a "founder" of Bear Stearns, as opposed to having been a former partner there. Accordingly, the Court concludes that any representations concerning Bill Gates and Bear Sterns were immaterial to the Lenders' decision to invest.

120.    The Court further concludes that the Lenders did not justifiably rely on the Representations. In determining whether the Lenders justifiably relied on the Representations, this Court considers, inter alia, factors: (1) the sophistication and expertise of the Lenders in financial and securities matters; (2) the existence of longstanding business or personal relationships between the parties; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the

27

fraud; (6) the opportunity to detect the fraud; (7) whether the Lenders initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations. See Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1032 (2d Cir. 1993).

121.    The Court concludes that S. Lin did not justifiably rely on the representation that Platinum would use the loan proceeds to invest in ProtoStar or on the other representations. First, the Lin Note does not justify a person of ordinary intelligence to conclude that Platinum's authority to invest the loan proceeds was restricted to ProtoStar, particularly given that the "LOAN PURPOSE" stated in the Lin Note purported to give Platinum discretionary authority over the loan proceeds. Moreover, S. Lin already knew by the time she signed the Lin Note that Platinum's opportunity to invest in ProtoStar was no longer available to Platinum. She acquired knowledge of that fact based upon her attendance at Dressel's director's meetings, her involvement in running Dressel's office with M. Lin in 2004 and 2005, and her relationship with M. Lin, her sister, who initiated her investment in Platinum and the presentment and execution of the Notes. More importantly, S. Lin's decision to sign the Lin Note appears to have been made in reliance on the fact that she was going to use someone else's money, i.e., Farida's money, and on the advice of M. Lin. As Farida did not testify, the Court cannot presume to know what Farida relied upon in making her decision to fund the Lin Note.

122.    As for Mochdar, the Court concludes that Mochdar did not justifiably rely on the representation that Platinum would use the loan proceeds to invest in ProtoStar or on the other representations. As with the Lin Note, the Mochdar Note does not justify a person

28

of ordinary intelligence to conclude that Platinum's authority to invest the loan proceeds was restricted to ProtoStar, particularly given that the "LOAN PURPOSE" stated in the Mochdar Note purported to give Platinum discretionary authority over the loan proceeds. Moreover, Mochdar relied upon the short-term status of the investment and not the investment worthiness of Platinum or ProtoStar in deciding to fund the Mochdar Note. Mochdar chose to rely on M. Lin's word based upon his longstanding relationship with her as a friend and investment advisor and because of her relationship with Dressel. Indeed, M.. Lin initiated his investment in Platinum and the presentment and execution of the Mochdar Note.  M. Lin knew that an investment in ProtoStar was no longer available by the time Mochdar signed the Mochdar Note.  Notably, while Mochdar's sophistication as an investor and his investment in a satellite communications company gave him special knowledge and access to marketplace publications and analyses to assess the investment worthiness of ProtoStar, he chose instead to rely on his relationship with M. Lin and M. Lin's representation that his investment would be for a term not to exceed two years.  Cf. Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984) ("where sophisticated men engaged in major transactions enjoy access to critical information but failed to take advantage of that access, New York Courts are particularly disinclined to entertain claims of justifiable reliance").

123.   Accordingly, Lin/Mochdar have failed to establish their securities fraud claim, and the claim is dismissed.[8]

D.  Common-Law Fraud Claim

---

[8]Based on this determination, the Court need not determine whether the securities fraud claim is barred by the statute of limitations or the in pari delicto or unclean hands doctrines.

29

124.    Lin/Mochdar assert a claim for common-law fraud under New York law.  The elements of common-law fraud are essentially the same as those for a claim under § 10(b).  <u>See</u> <u>Dover Ltd. v. A.B. Watley, Inc.</u>, 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006).  To state a claim for common-law fraud under New York law, a plaintiff must show:  (1) a material representation or omission of fact; (2) made with knowledge of its falsity; (3) with scienter or an intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) such reliance caused damage to the plaintiff.  <u>See id.</u>; <u>Farey-Jones v. Buckingham</u>, 132 F. Supp. 2d 92, 105 (E.D.N.Y. 2001).

125.    Upon consideration, the Court dismisses the common-law fraud claim for the same reasons supporting dismissal of the securities fraud claim.

E.  <u>Breach of Contract Claim Against Platinum</u>

126.    Lin/Mochdar assert a breach of contract claim under New York law against Platinum based upon its failure to repay the Notes.

127.    Platinum maintains that the Lenders released it from its obligations to pay the amounts due pursuant to the Notes.

128.    Platinum argues that under New York law, absent fraud or misrepresentation, if a creditor agrees to accept, in full satisfaction, payment of a liquidated claim different from that called for by the contract between the parties, and the variant payment might be of greater benefit to the creditor than that contemplated by the contract, such transaction works an accord and satisfaction.  <u>See Jaffray v. Davis</u>, 79 Sickels 164 (1891).  In this respect, Platinum argues that it was released from its obligations under the Notes in consideration for agreeing to release the balance of the funds it had in its possession to

30

the Lins and Daleiden to enable them to proceed with a new venture concerning Manor Capital in Indonesia.

129.    Upon consideration, the Court concludes that the evidence is not sufficient to establish an accord and satisfaction pursuant to which Platinum was released from its obligations under the Lin Note based on an agreement concerning Manor Capital. Similarly, the evidence is not sufficient to show that Daleiden's purported "assumption" discharged Platinum from its obligations under the Notes. However, the Court concludes that, given S. Lin's conduct in connection with Platinum's funding of the Manor Capital office, Platinum is discharged from the Lin Note to the extent it paid funds to or on behalf of Manor Capital, _i.e._, the $250,000 paid to S. Lin and transferred to M. Lin, referenced above, plus $335,000 ($260,000 on December 1, 2006 and $75,000 on December 4, 2006). Accordingly, Platinum is liable to S. Lin for payment of the Lin Note, less $585,000.

130.    As to Mochdar, however, the Court concludes that no accord and satisfaction or release has been shown as to Platinum's obligation under the Mochdar Note, and the Mochdar Note remains unpaid.

131.    Moreover, the evidence does not show that Mochdar engaged in any fraudulent or improper conduct that would excuse Platinum's obligation under the Mochdar Note or that any fraudulent or improper conduct on the part of any other person should be attributed to him for such purposes. Accordingly, Platinum is liable to Mochdar for payment of the Mochdar Note.[9]

---

[9]To the extent that defendants assert that this claim is barred by the in pari delicto and unclean hands doctrines, even assuming these defenses were properly raised, the Court

31

F.  <u>Alter Ego Claim Against Mabey and Teitelbaum</u>

132.    Lin/Mochdar claim that Mabey and Teitelbaum are personally liable for any judgment this Court may impose against Platinum because they operated the company with a unity of interest and ownership such that the separate personality of Platinum ceased to exist and Platinum became the alter ego of both Mabey and Teitelbaum.

133.    The parties agree that New York choice-of-law rules require that the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders or members. <u>See</u> <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1456 (2d Cir. 1995); <u>Kalb, Voorhis & Co. v. American Fin. Corp.</u>, 8 F.3d 130, 132 (2d Cir. 1993).  Since Platinum was incorporated in the state of Utah, that state's laws apply in determining if its members are personally liable for Platinum's contractual obligations because they were the alter egos of Platinum.

134.    Courts in Utah apply the same veil-piercing doctrine to limited liability companies such as Platinum as they do to traditional corporations. <u>See</u> <u>Ditty v. CheckRite, Ltd.</u>, 973 F. Supp. 1320, 1335-36 (D. Utah 1997).

135.    Under Utah law, to disregard the corporate entity under the alter-ego doctrine, a plaintiff must show:  "(1) [s]uch a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, but the corporation is, instead, the alter ego of one or a few individuals; and (2) if observed, the corporate form would sanction a fraud, promote injustice, or result in an inequity." <u>Colman v. Colman</u>, 743 P.2d 782, 786 (Utah App. 1987).  A plaintiff need not prove actual fraud, but must show

concludes that the evidence does not show sufficient wrongful conduct by or attributable to the Lenders to bar their claim.

32

that the failure to pierce the corporate veil would result in an injustice. Id. As the Colman court reasoned, "[i]f a principal shareholder or owner conducts his private and corporate business on an interchangeable or joint basis as if they were one, he is without standing to complain when an injured party does the same." Id. The Colman court identified eight "significant, although not conclusive," factors to consider in determining whether the corporate veil should be pierced:

> (1) under capitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders; and (8) the use of the corporate entity in promoting injustice or fraud.

Id.

136.    Six of the eight factors weigh in favor of piercing Platinum's veil. Two factors – nonpayment of dividends and nonfunctioning of other officers or directors – are not applicable, given that Platinum was a two-person limited liability company without outside shareholders.

137.    As for undercapitalization, Platinum's obligations to the Lenders and other investors clearly exceeded its assets during the relevant period.

138.    As for observing corporate formalities, Platinum's tax returns were prepared long after their due dates, and Platinum did not operate in accordance with its own operating agreement in many significant respects.

139.    As for siphoning of company funds, despite Platinum's large liabilities to investors, both Mabey and Teitelbaum took substantial amounts of cash and property (such as four

33

Mercedes-Benzes) from Platinum when it was insolvent and which impaired its prospects of repaying its investors. As noted, there are no documents, or other reason to believe, that the funds that Mabey and Teitelbaum took from Platinum were in any way connected to their performance, to work performed, or to any reasonable yardstick of executive compensation. Much of the money and property taken by Mabey and Teitelbaum was not recorded or not recorded correctly in Platinum's books or tax returns.

140. As for the absence of corporate records, Platinum did not keep contemporaneous accounting books and records, timely file tax returns, or properly account for Platinum's tangible personal property when S. Lin's and Mochdar's investments were received and expended.

141. As for using the company as a façade, Mabey and Teitelbaum frequently used Platinum's funds for personal expenses having nothing to do with earning money for Platinum.

142. As for using the company to promote injustice or fraud, Mabey and Teitelbaum transferred large amounts of money from Platinum to themselves. The vast majority of "invested" money went directly into Mabey's and Teitelbaum's pockets, clearly working an injustice upon S. Lin and Mochdar.

143. Platinum had no genuine existence independent of the interests of Mabey and Teitelbaum. Mabey and Teitelbaum conducted Platinum's business interchangeably with their personal interests, and, therefore, they are liable for Platinum's obligation to S. Lin and Mochdar.

34

## CONCLUSION

For the above reasons, S. Lin and Mochdar are awarded judgment against Platinum for breach of contract and against Mabey and Teitelbaum as alter ego's of Platinum for Platinum's breach of contract, and their remaining claims against defendants are dismissed.  Lin/Mochdar are directed to submit an appropriate judgment.

SO ORDERED.

_____/s/_____
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
      August 3, 2010